IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH - CENTRAL DIVISION

| | |
|---|---|
| KT GROUP, LLC, and EAGLE MOUNTAIN PARTNERS, LLC,<br><br>      Plaintiffs,<br><br>v.<br><br>CHRISTENSEN, GLASER, FINK, JACOBS, WEIL & SHAPIRO, LLP; ROGER HOWARD, an individual; JOSEF BOBEK, an individual, and JERRY KATZ, an individual,<br><br>      Defendants. | **MEMORANDUM OPINION AND ORDER**<br><br>Case No. 2:07-CV-790<br><br>Judge Dee Benson |

This matter is before the court on several motions for summary judgment and a motion to strike. Defendants Christensen, Glaser, Fink, Jacobs, Weil & Shapiro, LLP, Roger Howard, Josef Bobek, and Jerry Katz (collectively "CG defendants") seek summary judgment on the grounds that there is no liability (*see* Dkt. No. 232) and there is an absence of recoverable damages (*see* Dkt. No. 234). Plaintiffs KT Group, LLC and Eagle Mountain Partners, LLC (collectively "KT Group") seek partial summary judgment on liability against the CG defendants (*see* Dkt. No. 240) and move to strike the report and anticipated testimony of Ralph R. Mabey (*see* Dkt. No. 248). The court heard oral argument on the matter on July 29, 2010. Having considered the parties' arguments, memoranda, and the relevant law, the court enters the following Memorandum Opinion and Order.

## BACKGROUND

On May 8, 2006, KT Group entered into a real estate purchase contract (the "KT Agreement") to buy approximately six acres of real property located at 7101 Silver Lake Drive in

Park City, Utah, which is part of the Deer Valley Resort (the "Deer Valley Property" or "Property"). According to KT Group, the Deer Valley Property was the most valuable property in Utah at the time KT Group entered into the KT Agreement. The sellers, North Silver Lake Lodge, LLC ("NSLL") and 7101 Silver Lake, LLC ("7101") were two of over 150 companies created and controlled by Val Southwick ("Southwick"), now a convicted felon. From 1990 through 2006, Southwick operated something akin to a giant Ponzi scheme, using his companies to shuttle money from investors to pay bills or other investors.

The CG defendants are the law firm of Christensen, Glaser, Fink, Jacobs, Weil & Shapiro, LLP, and its attorneys Roger Howard, Josef Bobek, and Jerry Katz. The CG defendants were hired by the Covenant Group entities (including former defendants Heritage Orcas Partners, LP, Boundary Bay Capital, LLC, Covenant Capital, LLC, Covenant Bancorp, Inc., and Heritage Orcas VL Partners, LP) to represent Covenant Group in collecting loans made to various entities controlled by Southwick. The Covenant Group and Southwick were involved in various investment projects beginning at least as early as the latter half of the 1990s.

A.     Southwick's Funding of the Deer Valley Property

With the intention of developing the Deer Valley Property in cooperation with the Ritz Carlton hotel chain, Southwick incurred millions of dollars of debt in acquiring the Property and beginning its development. NSLL acquired the Property in July 2001. NSLL obtained financing from U.S. Bank in the amount of approximately $12 million, in exchange for which U.S. Bank held a first mortgage on the Property. In addition to the first mortgage, Southwick created an entity known as Five Star Lending, LLC ("Five Star") and caused NSLL to grant to Five Star a second mortgage (the "Five Star Mortgage") on the Property in July 2002. Five Star then solicited loans from various individuals and entities. In the fall of 2002, the Covenant Group

made a loan of $2.6 million to Five Star (the "Five Star Loan"). In exchange for the Covenant Group's loan, Five Star endorsed and assigned to the Covenant Group a fractional interest in the Five Star mortgage. In all, Five Star loaned millions of dollars to NSLL for debt service or to fund potential development of the Property.

In January 2005, Harrison Horn, the former owner of the Deer Valley Property, began to foreclose on the Property to recover $9.7 million NSLL owed on a promissory note. In order to raise the funds necessary to pay Mr. Horn and prevent him from foreclosing on the Property, Southwick formed 7101. Thereafter, 7101 obtained a loan in the approximate amount of $9.7 million from two members of the Covenant Group (the "7101 Loan"). In exchange for the 7101 Loan, 7101 issued a promissory note to the Covenant Group dated January 21, 2005 in the amount of $9.7 million (the "7101 Note"). (*See* Pl.'s Ex. 3A.) The 7101 Note provided that it is "secured by a Deed of Trust encumbering real and personal property and improvements described therein." (*Id.*)

As security for the 7101 Note, Southwick represented that he would cause NSLL to subdivide six lots (the "Cottage Lots") from the Deer Valley Property, transfer them to 7101, and pledge a deed of trust on the Cottage Lots in favor of the Covenant Group. Consistent with Southwick's representation, NSLL and 7101 entered into a purchase and sale agreement dated January 21, 2005 under which NSLL agreed to convey the six Cottage Lots to 7101 for $9.7 million. (*See* Def.'s Ex. 12.) There is also an unsigned deed of trust, dated January 21, 2005, from NSLL to the Covenant Group that claims to secure repayment of the 7101 Loan (the "NSLL/Covenant Deed of Trust") with the Cottage Lots. (*See* Pl.'s Ex. 3D.) On November 10, 2005, Southwick, on behalf of 7101, also executed a deed of trust (the "7101/Covenant Deed of Trust") in favor of the Covenant Group on the Cottage Lots to secure the 7101 Loan. (*See* Pl.'s

Ex. 3F.)  On the same day, Southwick's office delivered the 7101/Covenant Deed of Trust to High Country Title, with a letter instructing High County "once you are satisfied with these documents, please record immediately." (*Id.*)  This letter was copied to and received by Southwick's attorney, Barry Lawrence ("Lawrence"). (*See* Def.'s Ex. 14.)  When Mr. Lawrence received the letter, he advised Southwick through a November 12, 2005 e-mail that Southwick should not have the 7101/Covenant Deed of Trust recorded because it might have an effect on NSLL's development efforts with Ritz Carlton. (*See* Def.'s Ex. 15.)

B.    KT Group's Agreement to Purchase the Deer Valley Property

NSLL eventually elected to try to sell the Property because Southwick could not finance the Property's development.  NSLL retained a broker, Prudential Utah Real Estate, and solicited bids from several interested parties.  In May 2006, NSLL entered into discussions with several parties concerning the possible sale of the Deer Valley Property at a price of approximately $30 million.  At this point in time, Southwick had not fulfilled his promise to the Covenant Group.  A plat map assigning a legal description to the Cottage Lots had been recorded, however, NSLL had not actually transferred the Cottage Lots to 7101 and Southwick had not recorded a trust deed in favor of the Covenant Group.

On May 8, 2006, KT Group entered into a purchase agreement with NSLL, pursuant to which KT Group agreed to buy the Property for $30 million, subject to the clearing of a cloud on title referred to as the "Horn Contingency." (Pl.'s Ex. 5.)  In addition to NSLL, the KT Agreement also identifies 7101 as a seller with the following explanation: "NSL[L] is the record owner, but 7101 [Silver Lake] LLC is the beneficial owner of the portion of the Property described as Parcels B through G on Exhibit 'A' [the six 'Cottage Lots' described earlier]."

(Pl.'s Ex. 5, Addendum No. 2.)  The above referenced "Horn Contingency" is described in

Addendum No. 2 of the KT Agreement:

> 15.  Horn Contingency.  In connection with the Seller's purchase of the Property,
> Seller agreed to permit Harrison Horn, an affiliate of the party that sold the
> Property to Seller ("Horn"), to purchase for an agreed-upon purchase price a
> condominium unit of specified size and location in any multi-story, multi-unit
> resort lodge to be developed on the Property. . . . [U]nder certain circumstances
> Seller has the right to terminate Horn's interest in and right to purchase a
> condominium unit upon payment of a specified sum to Horn.  Buyer's and
> Seller's respective obligations to purchase and sell the Property pursuant to this
> [KT Agreement] shall be contingent upon Seller entering into an agreement with
> Horn . . . that any right of Horn to purchase a unit in [the] development at the
> Property has terminated (the "Horn Contingency").

(*Id.*)  The parties later amended the agreement to allow KT Group to purchase the Property and

close subject to whatever interest Horn might have, in exchange for the creation of a $2.6 million

indemnity fund out of the proceeds of the closing, which KT Group could use to litigate or settle

with Horn, with any remaining funds to be returned to NSLL.  (*See* Pl.'s Ex. 65C, Third

Amendment of the KT Agreement.)

Stewart Title Guaranty Company ("Stewart Title") was the escrow agent retained by

NSLL and KT Group to close and insure the sale of the Property.  The target closing date was

November 13, 2006.

C.    The CG Defendants' Escrow Demands

When it was anticipated that the Deer Valley Property would be sold to KT Group, the

CG defendants took the position that certain Covenant Group loans should be repaid from the

proceeds of the sale.  Accordingly, on September 20, 2006, the CG defendants sent an "Escrow

Demand" to Stewart Title demanding payment of the Kenton Loan[1], the Five Star Loan and the

---

[1]The Covenant Group made a loan in the amount of $4,000,000.00 (the "Kenton Loan")
to Kenton Investments, LLC ("Kenton").  Kenton is controlled by Southwick.  Covenant Group
made the Kenton Loan and Kenton executed a Promissory Note on June 17, 2002 (the "Kenton

7101 Loan.[2] (*See* Pl.'s Ex. 21.)  In a confidential memorandum with a subject line titled "Val Southwick/Deer Valley Loans", Christensen Glaser attorney Josef Bobek characterized the circumstances surrounding the Escrow Demand as follows:

> [The Five Star Loan, the 7101 Loan, and the Kenton Loan] are currently in default. It is our understanding that the [Deer Valley Property] is being sold and in escrow for $30,000,000.00.  There is a first trust deed on the [Deer Valley Property] held by U.S. Bank in the principal amount of $12,503,748.14.  It is our understanding that through his control of Five Star [he] subordinated the [Deer Valley] Deed of Trust to the U.S. Bank deed of trust without notice to or approval from our client.  NSLL and Southwick represented to us that the [Five Star Loan], the [NSLL Loan], and Kenton Loan (and the other Southwick loans made by our client) would be brought current by September 20, 2006, and contingent thereon, we agreed to receive certain disbursements, for approximately one-half of the outstanding balance of the loans, from the escrow as partial payment under said loans.  As an additional condition, a security instrument would be recorded against one or more other Southwick properties for the deficiency balance of the [Five Star Loan], the [NSLL Loan] and the Kenton Loan.
>
> NSLL and Val Southwick failed to bring the loans current by September 20, 2006 and, therefore, we made the following demand for payment from escrow to Stewart Title. . . . As escrow does not have the funds to satisfy the Demand, the Demand has essentially stalled the sale and [KT Group] is threatening to sue for specific performance.

(Pl.'s Ex. 29C.)  The CG defendants considered the three loans to be NSLL and Southwick loans.

 Mr. Bobek also discussed the nature of the 7101 Loan in the memorandum, stating:

> The [7101 Note] was to be secured by a Deed of Trust . . . dated January 21, 2005 and recorded as a first deed trust against all lots subdivided from the [Deer Valley Property].  NSLL never subdivided the [Deer Valley Property] or recorded any form of security for the [7101 Note].  I'm not sure if this will create an issue down the road, but please note, the [NSLL/Covenant Deed of Trust] was prepared with NSLL as the Trustor and [the Covenant Group] and VesCor Capital Corp, a Nevada

_____

Note").  The Kenton Loan is an unsecured equity loan through which Kenton purchased 13.33% interest in the membership stock of NSLL.

[2]The Escrow Demand misrepresented that the CG defendants represented 7101 and Kenton and that it had authority to make demands on escrow in the name of those companies or for their alleged benefit.  Christensen Glaser attorney Bobek claims that the misrepresentations arose because he inadvertently transposed the description of the lender with the description of the borrower.

corporation ("VesCor") as beneficiaries, while the [7101 Note] was made by [7101] for the benefit of [the Covenant Group].

(*Id.*) At the request of Stewart Title, in early October 2006, Southwick asked for payoff statements (or beneficiary statements) from each of the 62 Five Star Loan lenders, including the Covenant Group. All but five lenders signed and returned the beneficiary statements, waiving interest after May 2006. Four of the five dissenting lenders were Covenant Group entities.

Subsequent to Southwick's request for the Five Star beneficiary statements, the CG defendants attempted to negotiate with Southwick's lawyers regarding what consideration Covenant Group would take for waiver of its 7101 rights and Kenton rights. The CG defendants also attempted to negotiate with Prudential Real Estate to convince it to reduce the amount of commission it was entitled to under the KT Agreement, with the hope that a commission reduction would generate excess proceeds which could be paid to the Covenant Group. In addition, the CG defendants attempted to negotiate with KT Group to convince KT Group to waive or alter its right under the amendment to the purchase agreement for a $2.6 million hold-back to protect KT Group against potential claims of the previous owner of the Property, Mr. Horn.

On November 8, 2006, Christensen Glaser attorney Howard reported to the Covenant Group:

> I have been racking my brains to come up with some out of the box ideas (I woke up at 4:30 this morn thinking about it); some ideas include[:] purchasing Deer Valley for a nominal amount and therefore control our destiny), purchasing US Bank's loan and foreclosing on Harrison [Horn], you calling Harrison to see if you can cut a deal with him, finding the original 7101 North Star Deed of Trust and recording it, our filing a lis pendens, etc, however, all of these alternatives have some major potential adverse consequences. In the interim, we are exploring the liability issue against the title co who improperly reconveyed Five Star's loan, because if we conclude there is liability and damages, then the decision to work with the Buyer may make more sense (keeping in mind that because Val never recorded the 7101 Loan, the title co

would not have any liability for re-conveying this loan because it was never recorded).

(Pl.'s Ex. 63.)  On November 9, 2006, with closing scheduled for November 13, 2006, the CG defendants sent an e-mail to Stewart Title, KT Group, and others stating that Covenant Group's September 20 Escrow Demand had not been rescinded, and that Covenant was not ready to release the original Five Star beneficiary statements because of outstanding issues and ongoing negotiations.  (*See* Pl.'s Ex. 68C.)  The sale of the Property did not close on November 13, 2006. On November 14, 2006, the CG defendants submitted an "Amended Escrow Demand" to Stewart Title which demanded payment of the Five Star Loan and the 7101 Loan.  (*See* Pl.'s Ex. 81C.) The Amended Escrow Demand did not demand payment of the Kenton Loan.  (*See id*.)  After receiving the "Amended Escrow Demand" on November 14, 2006, the escrow agent sent out the following e-mail:

> To All:
>
> I am in receipt of a revised Escrow Demand (copy attached) which now is placing a demand on this escrow for additional accrued interest on the funds we are allocating to certain sub-lenders under the Five Star loan and demanding payment for an unsecured loan from 7101 Silver Lake, LLC.  This entity was never in title and as such any loan from them to additional lenders is not a recorded lien against the property.
>
> This escrow is in a position to pay to certain sub lenders of the Five Star loan the funds they agreed was owed to them pursuant to payoff letters signed by them (copies attached) in the total amount of $2.6 Million.  Also, all sub lenders under the Five Star loan executed a Loan Management Agreement with Five Star that it could reconvey the Deed of Trust upon an agreed payoff number which number on the 10/26/06 closing statement was $14,279,617.17.  The payoff amount due to Five Star is being distributed from this escrow directly to all of the sub lenders per their executed and notarized payoff letters.  This amount will not be paid to any outside party as your Demand Letter seems to dictate.
>
> Each day that now passes while this escrow awaits the receipt of the original payoff statements from Covenant/Heritage Orcas sub lenders, decreases any amount the Seller may receive from the closing.  Daily interest is accruing on the US Bank loan, the delinquent taxes and the Mechanic's lien.  As you can easily see, there are no

funds available to pay any unsecured lien, to pay additional interest to any of the sub lenders, nor to pay any attorney fees. If there is a payoff due from the Seller for an unsecured lien and/or attorney fees due with respect to that lien, then those matters need to be handled with the Seller outside of this escrow.

The Buyer is ready, willing and able to fund and instruct her Lender to fund this escrow so that we can close. I need the original Beneficiary payoff statements in my hand before I tell her to fund. All we are waiting for is to know that all issues are resolved as far as this closing is concerned with the Covenant/Heritage Orcas sub lenders and that they accept the total payment of $2.6 Million.

(*See* Pl.'s Ex. 81B.) Within hours, the CG defendants responded to the escrow agent's e-mail:

The purpose of this e-mail is to clarify certain statements in your e-mail.

(1) Our demand is for principal and accrued interest under the secured Five Star loan and the unsecured [7101 Loan] (which was to be secured by a deed of trust, which was never recorded). I am not aware of any Deed of Trust. The interest of [7101] (if any) is only reflected in the [KT Agreement] – not of County record. Therefore, this is an unsecured loan and between the Seller and your clients – not escrow on this sale.

(2) The Beneficiary Statements have never been released or submitted to escrow. . . .

(3) Our clients' demand has always included principal and interest due and owing under the [7101 Loan]. . . .

[4] Our clients' demand does not include attorney's fees or legal costs. . . .

(*Id.*) On November 16, 2006, also in response to the escrow agent's November 14 e-mail, the CG defendants delivered six original beneficiary statements (four for the Five Star Loan and two for the 7101 Loan) to the escrow agent. (*See* Pl.'s Ex. 85A). The CG defendants' letter accompanying the beneficiary statements read:

Please be advised that your closing escrow and reconveying the Five Star Lending, LLC, deed of trust without both paying all sums due Covenant as set forth in the enclosed Beneficiary Statement will cause Covenant substantial damages, for which we shall hold Escrow Holder and Stewart Title Company liable for. If you believe the Loan Management Agreement grants you and Stewart Title the authority to close escrow and not pay all funds due and owing to Covenant, then you are proceeding at your own risk and we will hold all parties responsible for any damages incurred by Covenant.

(*Id.*)  The CG defendants' assertion of the 7101 Loan caused the claimed amounts due to exceed the purchase price of the Deer Valley Property.  Stewart Title terminated escrow on November 20, 2006.  After escrow was terminated, the CG defendants and the Covenant Group continued to negotiate with Southwick, NSLL, and KT Group.  These negotiations continued through late February 2007.

D.    Regent's Agreement to Purchase the Deer Valley Property

In or around December 2006, the CG defendants contacted Regent Properties, Inc. ("Regent"), by way of its manager Jeff Dinkin, to see if he would be interested in acquiring the Deer Valley Property.  Regent eventually entered into an agreement with NSLL and Southwick pursuant to which Regent acquired the outstanding membership interests in NSLL and certain other debt obligations secured by the Deer Valley Property.  Between March 1, 2007 and April 9, 2007, the CG defendants drafted several versions or revisions of a potential agreement between Regent and the Covenant Group that included language requiring Covenant Group to vote in favor of a plan of reorganization in a future bankruptcy case in exchange for some form of compensation.  However, no such agreement between Regent and the Covenant Group was ever executed.  On April 26, 2007, after Regent's successful purchase of NSLL, NSLL filed a voluntary petition for Chapter 11 bankruptcy.

E.    The Lawsuit

On October 15, 2007, KT Group filed the instant lawsuit against the CG defendants, Covenant Group, Regent, and related affiliates and individuals.  On October 26, 2007, KT Group filed an amended complaint.  KT Group's amended complaint asserted two causes of action against the Covenant Group and the CG defendants: intentional interference with economic relations and civil conspiracy.

Regarding KT Group's intentional interference claim, KT Group contended that Covenant Group and the CG defendants intended to prevent KT Group from closing on the KT Agreement with NSLL. KT Group asserted that Covenant Group and the CG defendants undertook such action for the purpose of using the leverage thus created against other parties to force them to waive or reduce their rights under the Third Amendment to the KT Agreement. KT Group also claimed that the Covenant Group's and the CG defendants' actions were undertaken for the improper purpose of extorting money from KT Group and others. KT Group further contended that Covenant Group's and the CG defendants' actions were undertaken by improper and wrongful means, including wrongful escrow demands, refusing to timely deliver effective original beneficiary statements, eventually delivering conditional original beneficiary statements conditioned on payment of secured and unsecured loans, and by slandering title to the Property to be purchased by KT Group. Finally, KT Group claimed that the Covenant Group and the CG defendants prevented the KT sale from closing on November 13, 2006 or thereafter, inasmuch as the improper demands and conditions were not withdrawn, and denied KT Group the benefit of its bargain with NSLL.

With regard to the civil conspiracy cause of action, KT Group claimed that Covenant Group, the CG defendants, and Regent conspired to further Covenant's continuing efforts to wrongfully interfere with KT Group's right to close under the KT Agreement by acquiring control of NSLL and its major creditors and then developing the Deer Valley Property for the benefit of Regent and other Dinkin-controlled entities.

In January 2008, KT Group settled and released their claims against all defendants in this action, except the CG defendants, in exchange for $10.25 million. Pursuant to the settlement agreement, KT Group conveyed any right, claim, or interest they had in the Deer Valley Property

to the settling defendants.  KT Group seeks roughly $130 million in damages from the CG defendants.

In November 2009, the CG defendants moved for summary judgment claiming there is no liability and an absence of recoverable damages.  In January 2010, KT Group moved for partial summary judgment claiming the CG defendants are liable.  In February 2010, KT Group also moved to strike the expert report and anticipated trial testimony of Ralph R. Mabey.

## DISCUSSION

As noted above, KT Group has brought two claims against the CG defendants: intentional interference with KT Group's economic relations and civil conspiracy.  The court will address the parties' cross motions for summary judgment on the CG defendant's liability and the CG defendants' motion for summary judgment claiming there is an absence of recoverable damages, and then KT Group's motion to strike the expert report and anticipated testimony of Mr. Mabey.

A.      The Parties' Motions for Summary Judgment

Federal Rule of Civil Procedure 56 permits the entry of summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986).  The court must "examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment." *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be

insufficient [to overcome a motion for summary judgment]; there must be evidence on which the jury could reasonably find for the plaintiff." *Liberty Lobby*, 477 U.S. at 252; *see also Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1175 (10th Cir. 1999).

On those issues for which it bears the burden of proof at trial, the nonmovant "must go beyond the pleadings and designate specific facts to make a showing sufficient to establish the existence of an element essential to [its] case in order to survive summary judgment." *Cardoso v. Calbone*, 490 F.3d 1194, 1197 (10th Cir. 2007) (internal quotations omitted). "Failure of proof of an essential element renders all other facts immaterial." *Koch v. Koch Indus., Inc.*, 203 F.3d 1202, 1212 (10th Cir. 2000).

The CG defendants contend that they cannot be held liable for intentional interference or civil conspiracy because their good faith assertion of the rights of their clients cannot, as matter of law, constitute "improper means" supporting a claim for intentional interference or an "unlawful overt act" supporting a claim for intentional interference. The CG defendants further argue KT Group's claims fail because their conduct could not have caused KT Group's claimed damages and there is an absence of recoverable damages. KT Group, on the other hand, argues that the court can decide as a matter of law that the CG defendants intentionally interfered with KT Group's economic relations by use of wrongful means, causing injury to KT Group and that the CG defendants conspired to defraud KT Group. KT Group's memorandum in support of its motion for partial summary judgment states "[t]his case will rise or fall on this court's view of whether the law allows lawyers to employ wrongful means with impunity in the conduct of their profession, and escape responsibility for their behavior by asserting that they are merely tools for their client." (*See* Dkt. No. 241, Pl.'s Mot. for Partial Summ. J. at 1.)

*1.     Intentional Interference with Economic Relationships*

In this case, the parties agree that "the critical issue that ultimately governs the disposition of this case [is] whether it was proper for the CG defendants to assert the 7101 Loan against the Deer Valley Property.  Determining whether CG defendant's assertion of the 7101 Loan was proper is vital because it is undisputed that assertion of that loan is what caused the claimed amounts due to exceed the purchase price of the Property." (*See* Dkt. No. 276, Pl.'s Reply Mem. in Supp. of Pl.'s Mot. for Partial Summ. J. at 1 (quoting Dkt. 267, Def.'s Mem. in Opp. to Pl.'s Mot. for Partial Summ. J. at 25–26.))  Thus, summary judgment on KT Group's intentional interference claim will turn on whether CG defendant's assertion of the 7101 Loan against the Deer Valley Property was wrongful.  *See Leigh Furniture and Carpet Co. v. Isom*, 657 P.2d 293, 306 (Utah 1982).

The CG defendants argue that KT Group has not shown that CG defendants tortiously interfered with KT Group's economic relationships because the inclusion of the 7101 Loan in the escrow demand letters and beneficiary statements cannot constitute improper means because they in good faith believed that the Covenant Group had a legally protected interest in the Deer Valley Property.  Specifically, CG defendants argue their demand on escrow for the 7101 Loan was justified because of the existence of an equitable lien and pursuant to Utah law, the Covenant Group's 7101 Loan was a secured loan, even if it was not recorded.

KT Group argues that the CG defendants intentionally interfered with their economic relationships because their assertion of the 7101 Loan against the Deer Valley Property prevented KT's Agreement from closing and diverted KT Group from a valuable business opportunity.  Specifically, KT Group argues that the CG defendants' assertion of the 7101 Loan against the Deer Valley Property was wrongful because it misused a valid lien, violated Rule 4.4(a) of the

Utah Rules of Professional Conduct, constituted wrongful appropriation, was extortionary, constituted slander of title, and violated a common law rule of conduct set forth in the Restatement (Third) of Property: Mortgages, § 1.6.

In order to demonstrate intentional interference with the plaintiff's existing or potential economic relationships, the plaintiff must prove (1) that the defendant intentionally interfered with the plaintiff's existing or potential economic relations, (2) for an improper purpose or by improper means, (3) causing injury to the plaintiff." *Ferguson v. Williams & Hunt, Inc.*, 221 P.3d 205, 216 (Utah 2009) (internal quotations omitted). The case law makes it clear, however, that, if a defendant's conduct comes within the scope of a privilege, then the defendant is not liable to the plaintiff. *See Leigh Furniture,* 657 P.2d at 304 (holding that privileges apply to claims for intentional interference). Generally, a lawyer acting on behalf of a client and within the scope of the lawyer-client relationship is protected by such a privilege and is not liable for tortious interference to a third party.[3] When the defendants to an intentional interference claim are attorneys and the challenged conduct relates to the representation of a client, the challenged conduct must lack a good faith basis in fact and/or law to be actionable. *See Goldschmidt v. Paley Rothman Goldstein Rosenberg & Cooper, Chartered, et al.*, 935 A.2d 362, 381 (D.C. 2007) ("An attorney who pursues in good faith his or her client's interests on a matter debatable

---

[3]The rationale for a privilege to protect attorneys has long been recognized by the courts. *See In re Watts*, 190 U.S. 1, 29 (1903)("[I]f an attorney acts in good faith and in the honest belief that his advice is well founded and in the just interests of his client, he cannot be held liable for error in judgment. The preservation of the independence of the bar is too vital to the due administration of justice to allow of the application of any other general rule."). An attorney has a duty to zealously represent his clients within the bounds of the law. In fulfilling this duty, an attorney has the right to pursue rights that he deems necessary and proper, without being subject to liability or damages. If an attorney could be held liable to an opposing party for actions taken in the course of representing his client, he would be forced constantly to balance his own potential exposure against his client's best interest. Such a conflict hampers the resolution of disputes and the attainment of justice.

in the law cannot be held liable to an opposing party.").  Only in rare circumstances, such as

where the attorney is personally guilty of fraud, collusion, or a malicious act, will a party be

justified in suing his opponent's lawyers.  *See Newburger, Loeb & Co., Inc. v. Gross*, 563 F.2d

1057, 1080 (2d Cir. 1977).

The CG defendants' answer to KT Group's amended complaint states: "[KT Group's]

claims against the CG Defendants are barred and precluded because the conduct and actions of

CG Defendants were committed in the exercise of good faith with probable cause in furtherance

of the attorney-client privilege relationship and were justified under the circumstances then

apparent and were and are privileged."  (Def.'s Answer at 12.)  The court agrees.  Southwick and

the Covenant Group undisputably had the expectation that the Covenant Group would have a

security interest in the Cottage Lots to secure the 7101 Loan.  The Covenant Group retained the

CG defendants to provide legal advice in recovering the 7101 Loan.  The CG defendants knew

that as security for the 7101 Loan, Southwick promised that he would cause NSLL to subdivide

the Cottage Lots from the Deer Valley Property, transfer them to 7101, and pledge a deed of trust

on the Cottage Lots in favor of the Covenant Group.  The Covenant Group had the 7101 Note

stating and believing it was "secured by a Deed of Trust encumbering real and personal property

and improvements described therein."  (Pl.'s Ex. 3A.)  The CG defendants knew that the

unsigned NSLL/Covenant Deed of Trust existed and purported to encumber the Cottage Lots as

security for the 7101 Loan.  The CG defendants knew that Southwick was attempting to sell the

Deer Valley Property without fulfilling his promise.  It was justifiable under the circumstances

for the CG defendants to assert the 7101 Loan against the Property.  The CG defendants argue

there is substantial legal support under Utah law that the Covenant Group immediately had an

equitable lien on the Deer Valley Property as a result of the 7101 Loan and Southwick's

agreement that a trust deed on the Cottage Lots would be executed and recorded. The CG defendants base their argument on *D.K. Porter v. Searle*, 228 F.2d 748 (10th Cir. 1955) and *Olsen v. Kidman*, 235 P.2d 510 (Utah 1951). KT Group, on the other hand, argues that equitable liens do not come into existence until decreed by a court, and the CG defendants' claim is groundless because NSLL, whose property was supposedly to be charged with the lien, owed no debt to Covenant Group in connection with the 7101 Loan. KT Group bases its arguments mainly on *Olsen*, *Federal Land Bank of Berkeley v. Pace*, 48 P.2d 480 (Utah 1935) and *Pierson v. Jones*, 625 P.2d 1085 (Idaho 1981). Regardless of whether an equitable lien existed or not, the nature of the Covenant Group's rights are clearly debatable at law. The CG defendants had a good faith basis in law and fact to assert the 7101 Loan against the Deer Valley Property. In the muddle that Southwick created, the CG defendants had the duty and right to seek to protect the interests of the Covenant Group, without being subject to liability. Thus, KT Group's intentional interference claim against the CG defendants fails as a matter of law.

KT Group makes several arguments why the court should find that the CG defendants' conduct was not in good faith and wrong. KT Group argues that the CG defendants' assertion of the 7101 Loan was wrongful and cannot constitute good faith as a matter of law because the CG defendants leveraged the secured Five Star Loan in an attempt to obtain payment on the 7101 Loan. KT Group bases its argument primarily on *Hector, Inc. v. United Savings and Loan Assoc.*, 741 P.2d 542 (Utah 1987). In *Hector*, a developer entered into an agreement with United Savings and Loan Association ("United") and executed a promissory note and a deed of trust in favor of United to secure a loan of $800,000 to finance the development of a subdivision. *See id.* at 544. At approximately the same time, the developer obtained an improvement bond from Western Mortgage Loan Corporation ("Western Mortgage") in favor of the city to guarantee the

developer's workmanlike construction of the off-site improvements. *See id.* None of the documents executed by the developer with respect to the Western Mortgage bond provided security for the bond. *See id.* United and Western were separate corporations, but owned by the same shareholders, with the same directors and operating officers. *See id.* One of those officers represented both United and Western Mortgage in the transactions with the developer. *See id.* After the developer had paid all amounts owed under the promissory note, United told the developer that reconveyance of the property subject to the trust deed was conditioned on the city's release of the Western Mortgage improvement bond. *See id.* The developer filed suit claiming that United breached its statutory duty pursuant to Utah Code Ann. § 57-1-33 to return the security when he paid off the loan in full. *See id.* United asserted the good faith defense that it was industry practice to provide security for bonds and that since United and the developer had always expressly agreed in prior dealings to secure improvement bonds, the intent of the parties could not have been otherwise. The Utah Supreme Court acknowledged that the statute was not "meant to penalize one who honestly, though mistakenly, refuses to release or declare a mortgage of record because he believes that there has been no full satisfaction," but rejected United's course of dealing and industry usage argument because "there was never an agreement that Western Mortgage would be given security" on the improvement bond. *Id*. at 545. The court stated "United's use of the leverage of refusing to reconvey the land securing the trust deed to obtain security for another debt is not good faith by any reckoning." *Id*.

The court finds *Hector* inapplicable to this case because unlike in *Hector* where "there was never an agreement that Western Mortgage would be given security," here, there was an express agreement that the Covenant Group would be given security on the 7101 Loan. It is undisputed that Southwick agreed to secure the 7101 Loan with a deed of trust encumbering the

18

Cottage Lots of the Deer Valley Property. The 7101 Note stated it was secured by real property. The 7101/Covenant Deed of Trust indicated the 7101 Loan was to be secured by the Cottage Lots. The NSLL/Covenant Deed of Trust indicated the 7101 Loan was to be secured by the Cottage Lots. Whether or not a security interest was created, the evidence, as set forth above, supports a good faith basis to assert the 7101 Loan against the sale of the Property.

Next, KT Group argues the court should find the CG defendants did not act in good faith because the CG defendants confuse the facts by conflating the various entities involved. KT Group contends that Southwick, on behalf of 7101, may have promised Covenant Group a trust deed on a portion of the Property, but Covenant Group never received a signed trust deed from any entity, and NSLL never signed any document purporting to convey to Covenant Group any security interest in its Property, or even promising to do so. KT Group asserts that the fact that Covenant Group may have a claim against 7101 does not somehow magically translate into a claim against NSLL's real property. Contrary to KT Group's assertion, the CG defendants' fusion of Southwick, 7101 and NSLL is proper under the circumstances. At the time of the loans in question, Southwick was operating a Ponzi-like scheme comprised of over 150 entities that he created and controlled. Southwick frequently networked his entities and their assets to attract investors, shuttle money and structure deals. Here, Southwick used NSLL, Five Star, and 7101 to find investors for the Deer Valley Property. Southwick also controlled both 7101 and NSLL when he represented to Covenant Group that the 7101 Loan would be secured by real property then owned by NSLL. Based on Southwick's actions and representations, the court finds that "conflating the various entities involved" in considering the CG defendants' good faith is acceptable.

Finally, KT Group argues that the CG defendants' assertion of good faith should be precluded because there is no real-time evidence that the CG defendants believed the Covenant Group had a security interest. This argument is unavailing because there is evidence of such a belief. As discussed above, the CG defendants clearly were aware of Southwick's promise to secure the 7101 Loan with the Cottage Lots and some of the corroborating evidence. Moreover, the CG defendants discussed finding the original deed of trust and recording it, or filing a lis pendens. In addition, the CG defendants have sworn that at the time they asserted the 7101 Loan they believed their clients had an interest in the Deer Valley Property by way of an equitable lien. The CG defendants may not have publicly declared the existence of a lien, but the evidence shows that they recognized the likelihood that their clients had a security interest in the Deer Valley Property based on the 7101 Loan.

Within the same argument, KT Group also contends that the CG defendants could not have believed that the Covenant Group had a valid security interest because they expressly represented that the 7101 Loan was "unsecured." This argument is unavailing because evidence from the same time period as the escrow demands suggests that the 7101 Loan was referred to as "unsecured" due to the fact that Southwick never recorded the security interest. For example, in an August 30, 2006 e-mail to the CG defendants, the Covenant Group described the Five Star Loan as a "recorded loan" and the 7101 Loan as an "unrecorded loan." On September 22, 2006, the CG defendants identified the 7101 Loan as one that was to be secured by a deed of trust and recorded as a first trust deed against the Cottage Lots. On November 14, 2006, the CG defendants represented to escrow that their demand included the "unsecured" 7101 Loan with a disclaimer that the 7101 Loan was to be secured by a deed of trust, which was never recorded. Moreover, the court is unaware of any contemporaneous communication from the CG defendants

that stated the Covenant Group had no security interest in the Property. The CG defendants' reference to the 7101 Loan as "unsecured" did not necessarily mean that the Covenant Group had no security interest in the Deer Valley Property. Thus, a finding of good faith is not precluded because the CG defendants' arguments regarding the existence of a security interest are not inconsistent with the real-time evidence.

In sum, the court finds that KT Group's intentional interference claim fails as a matter of law because the evidence does not demonstrate that the CG defendants did anything wrong or outside the scope of the lawyer-client relationship.

2.    *Civil Conspiracy*

"To prove civil conspiracy, five elements must be shown: (1) a combination of two or more persons, (2) an object to be accomplished, (3) a meeting of the minds on the object or course of action, (4) one or more unlawful, overt acts, and (5) damages as a proximate result thereof." *Alta Indus. v. Hurst*, 846 P.2d 1282, 1290 n.17 (Utah 1993) (internal quotations omitted). Both sides agree that KT Group's claim for civil conspiracy hinges upon their claim for intentional interference with economic relations. Because, as explained above, the CG defendants' conduct was not improper or wrongful, they likewise did not commit any overt, unlawful act, and therefore KT Group's claim for civil conspiracy fails as a matter of law.

All in all, the CG defendants' motion for summary judgment asserting the absence of liability is granted and KT Group's motion for partial summary judgment is denied. Having reached this conclusion, the CG defendants' motion for summary judgment claiming an absence of recoverable damages is moot.

B.    Motion to Strike the Expert Report and Testimony of Mr. Mabey

KT Group has moved to strike the expert report of Mr. Mabey to the extent that the CG defendants rely on it in support of their motion for summary judgment.  KT Group has also moved for an order precluding the CG defendants from offering the testimony of Mr. Mabey in the trial.  The court finds KT Group's motion is moot because in ruling on the CG defendants' motion for summary judgment, the court did not rely on Mr. Mabey's testimony.  Moreover, there will be no trial on KT Group's claims.

## CONCLUSION

Based on the foregoing reasons, CG defendants' motion for summary judgment on no liability is GRANTED.  KT Group's motion for partial summary judgment is DENIED.  The CG defendants' motion for summary judgment based on absence of recoverable damages and KT Group's motion to strike are moot.

DATED this 29th day of September, 2010.

Dee Benson
United States District Judge